UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

WILLIAM E. DIRKES, M.D.,

    Plaintiff,

vs.

HARTFORD LIFE GROUP INSURANCE
COMPANY and GROUP LONG TERM
DISABILITY INCOME PROTECTION
PLAN of ANESTHESIA ASSOCIATES
OF CINCINNATI, INC.,

    Defendants.

Case No. 1:05-cv-254

Barrett, J.
Black, M.J.

**REPORT AND RECOMMENDATION[1] THAT DEFENDANTS' MOTION TO AFFIRM THE ADMINISTRATIVE DECISION (Doc. 49) BE DENIED; PLAINTIFF'S MOTION TO REVERSE THE ADMINISTRATIVE DECISION (Doc. 41) BE GRANTED; AND THIS MATTER BE REMANDED TO THE ADMINISTRATOR**

Plaintiff initiated this civil action on April 14, 2005 by filing a complaint against Continental Casualty Company, Charles Stedman & Co., Inc., and the Hartford Financial Services Group, pursuant to the Employee Income Retirement Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA"). (Doc. 1.) Plaintiff is seeking to recover long-term disability benefits.

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

This case is now before the Court on the plaintiff's motion for judgment on the Administrative Record (doc. 41), defendants Hartford Life Group Insurance Company ("Hartford") and Group Long Term Disability Income Protection Plan of Anesthesia Associates of Cincinnati, Inc. ("the Plan") (collectively "Defendants")'s motion for judgment on the Administrative Record (doc. 49), and the parties' responsive memoranda (docs. 53, 61, 64.)

## I.  BACKGROUND AND FACTS

In July 1998, the plaintiff, a physician, began working as a staff anesthesiologist for Anesthesia Associates of Cincinnati, Inc. ("AAC"), a physician practice group providing anesthesiology services in Greater Cincinnati. (AR 0683.) Effective July 1, 1998, plaintiff became a participant in the Plan. (AR 0683). At that time, the Plan's LTD coverage was insured by a 1998 policy issued by Continental Casualty Company (the "1998 Policy") (AR 0472-482).

A.  *The Plan*

Effective March 1, 2001, a new policy was issued by CNA Group Life Assurance Company to provide coverage to participants in the Plan (the "2001 Policy"). (POL_0001-0025). The 2001 Policy, which replaced and canceled the 1998 Policy, is the policy that was in effect when plaintiff sought the benefits which are the subject of this case. (Doc. 23 at 5).[2] Pursuant to a corporate name change, as reflected in an

---

[2] In his motion for judgment and responsive memoranda, plaintiff continues to argue that the July 1998 Policy applies to his claim and ignores the previous decision of the Court. (Doc. 41 at 15).
The parties have already briefed this issue and the Court has determined that the 2001 Policy applies. *See* Magistrate

endorsement to the 2001 Policy, that policy is currently underwritten by Hartford. (POL_0024) (noting an amendment that the "name CNA Group Life Assurance Company is replaced with the name Hartford Life Group Insurance Company wherever it appears").

The Plan provides that *disability* or *disabled* means a participant satisfies the Occupational Qualifier or the Earnings Qualifier.[3]  (POL 0007; POL 0020).

**Occupational Qualifier**

Disability means that Injury or Sickness causes physical or mental impairment to such a degree of severity that [the participant is]:

1) continuously unable to perform the *Material and Substantial Duties of Your Specialty*; and

2) not *Gainfully Employed*.

(POL 0007).

**Material and Substantial Duties** means the necessary functions of [the participant's] Regular Occupation or Specialty which cannot be reasonably omitted or altered.

**Regular Occupation** means the occupation [the participant is] performing for income or wages on your date of disability.  It is not limited to the specific

---

Judge's Report and Recommendation on the Motion to Dismiss (Doc. 12); Order Adopting Report and Recommendation (Doc. 23); *see also* Magistrate Judge's Report and Recommendation on Dirkes' Motion to Supplement Administrative Record (Doc. 39).  Because this is an issue that has previously been determined by the Court, and is now the law of the case, plaintiff cannot now argue that the 1998 Policy applies.  *See McMurtry v. Paul Revere Life Ins. Co.*, 67 Fed. Appx. 290, 295 (6th Cir. 2003) (denying plaintiff's claim on basis that "the law of the case doctrine precludes a court from reconsideration of identical issues."); *Coal Resources, Inc. v. Gulf & Western Industries, Inc*., 865 F.2d 761, 767 (6th Cir. 1989) (declining to address issue previously determined because "issues decided at an early stage of litigation, either explicitly or by necessary inference from the disposition, constitute the law of the case.").  The 2001 Policy, which replaced and canceled the 1998 Policy, is the policy that was in effect when Dirkes sought the benefits at issue in this action. (Doc. 23 at 5)

[3] Plaintiff asserts that he meets the Occupational Qualifier.  He is claiming that he cannot perform the material and substantial duties of his specialty, not that his condition is merely reducing his earning capacity such that he satisfies the Earnings Qualifier.

>occupation that [the participant] held with the Participating Employer.
>
>**Specialty** means the general or sub-specialty in which [the participant] is practicing for which there is a specialty or sub-specialty recognized by the American Board of Medical Specialties. Where no such specialty or sub-specialty is recognized, the participant will be considered to be practicing in the general specialty category.
>
>**Gainful Employment or Gainfully Employed** means the performance of any occupation for wages, remuneration or profit, for which [the participant is] qualified by education, training or experience on a full-time or part-time basis, and which [Hartford] approve[s] and for which [Hartford] reserve[s] the right to modify approval in the future."

(POL 020-21.)

The Plan documents also provide Hartford with the "sole discretionary authority… to determine [the participant's] eligibility for benefits and to interpret the terms and provisions of the plan and any policy issued in connection with it." (POL 0023).

*B. Plaintiff's Medical History*

In 1991, plaintiff was diagnosed with Gilbert's Syndrome.[4] (AR 0204). At the time of his diagnosis, plaintiff's blood work was checked to determine the total bilirubin levels as well as other enzyme levels in his blood. (AR 0204). Increased enzyme levels (also referred to as transaminase levels) in the blood may be signs that the

---

[4] Gilbert's Syndrome is a common, mild liver disorder in which the liver does not properly process a substance called bilirubin, which is produced by the breakdown of red blood cells. Also known as constitutional hepatic dysfunction, unconjugated benign bilirubinemia and familial nonhemolytic jaundice, Gilbert's Syndrome typically does not require treatment or pose serious complications.

liver is injured.[5] Common enzymes tested are SGOT (serum glutamic oxaloacetic transaminase) and SGPT (serum glutamic pyruvic transaminase). In 1991, plaintiff's SGOT level was 20, which was within the normal range. (AR 0204).

In 1999, plaintiff again underwent blood testing, after he sustained a needle stick in the course of his job. (AR 0204). His blood work showed that his SGOT level was again normal but that his SGPT level was 59, which is above the normal range. (AR 0204).

Additional laboratory blood testing was performed over the next few months. The results of these tests showed fluctuations in his transaminase levels. (AR 0204). Plaintiff's levels continued to fluctuate and, as a result, in December 1999, his primary care physician, Dr. Charles Eger, referred plaintiff to Bennett L. Blitzer, M.D., a liver specialist.

Dr. Blitzer first examined plaintiff on December 21, 1999. Following this initial examination, Dr. Blitzer questioned whether plaintiff's elevated transaminase levels were secondary to his nutritional supplement and ordered a complete set of liver chemistry tests. (AR 0205). The test resulted indicated that plaintiff's SGOT and SGPT levels had both returned to normal, 29 and 43, respectively. (AR 0203).

Dr. Blitzer advised Dr. Eger of plaintiff's condition in a letter dated February 8, 2000. (AR 0201-202). Dr. Blitzer noted his initial impression was that the elevate

---

[5] *See* Liver Blood Enzymes, http://www.medicinenet.com/liver_blood_tests/article.htm (last visited July 9, 2007).

transaminase levels were secondary to a nutritional supplement, but, in light of the continued abnormal SGPT levels, Dr. Blitzer doubted that the nutritional supplement was the cause. (AR 0202).  In a handwritten postscript, Dr. Blitzer "wondered" for the first time whether the elevated levels were the result of occupational exposure to anesthetic gases. ( AR 0202).

That same day, Dr. Blitzer performed an outpatient liver biopsy on plaintiff.  (AR 0200).  Dr. Blitzer's notes from the biopsy indicate a probable hepatotoxicity, but do not identify any cause.  (AR 0200).  Another biopsy was performed in October 2000, showing trace perivenual and portal fibrosis, several eosinophilis and occasional lymphocytes in portal tracts and 1+ finely particulate iron.  (AR 00361.)  Based on the biopsy results, Dr. Blitzer "strongly suspected" that plaintiff "was experiencing halogenated anesthetic hepatotxicity secondary to occupational exposure." (*Id.*)

Dr. Blitzer also performed monthly and/or bi-monthly testing of plaintiff's transaminase levels, through 2002, in an attempt to determine the cause of plaintiff's elevated levels.  Testing revealed normal levels on March 21, 2000, April 18, 2000, July 12, 2000, February 2001, July 2002, October 2002.  (*See* AR 198, 221, 241, 248, 251)  Plaintiff exhibited elevated levels on March 21, 2000 (SGPT), March 24, 2000, April 2000 (SGPT), May 21, 2000, October 2000, February 2001 (SGPT), July 2002 (SGPT), August 2000 (SGPT),  (*See* AR 192, 221, 241, 250, 251)

On January 3, 2003, Dr. Blitzer informed plaintiff that the only way to be certain whether anesthesia gases were causing the increased transaminase levels was for him to

-6-

take a prolonged absence from the operating room. (AR 0187). Plaintiff's enzyme levels were tested a few weeks later on January 29, 2003, at which point his SGOT levels remained within the normal range at 32 ,but his SGPT levels were elevated at 55. (AR 0220). Dr. Blitzer recorded his impression of plaintiff's condition as"halogenated anesthetic toxicity" and also noted that plaintiff's daily alcohol consumption had resumed. (AR 0189).

On February 3, 2003, Dr. Blitzer performed another outpatient liver biopsy. (AR 0188). Dr. Blitzer's notes from the biopsy indicated drug hepatoxicity and he did not identify any cause. (AR 0188). Thereafter, in April 2003, upon testing, plaintiff's SGOT levels remained normal at 28 while his SGPT levels remained elevated at 66. (AR 0220).

In a letter to Dr. Eger dated June 1, 2003, Dr. Blitzer summarized his treatment and impressions of plaintiff's condition, specifically stating that "the only way to be certain of an anesthetic etiology…would be a prolonged absence from the operating room (perhaps even four to six months)." (AR 0186). Dr. Blitzer suspected that occupational exposure was causing plaintiff's elevated enzymes. (*Id.*) Dr. Blitzer stated that plaintiff should take this "prolonged absence" from the operating room before he considered global changes in his occupation. (AR 0185-186) (emphasis added). Dr. Blitzer also told plaintiff to consume only minimal alcohol. (AR 0186).

On June 10, 2003, Kamal G. Ishak, M.D., Ph.D., the Chairman of the Department of Hepatic and GI Pathology at the Armed Forces Institute of Pathology at the Department of Defense provided a report comparing plaintiff's biopsies. (AR 0226-227). Dr. Ishak noted there did "not appear to be an increase in fibrosis, or in the quality of iron

-7-

in liver cells" between the two biopsies. (AR 0226). With respect to the link between anesthesia and elevated liver enzymes, Dr. Ishak reported that, while he was aware of one case from the 1960s in which an anesthetist who was exposed to a non-anesthetic does of halothane developed recurrent hepatitis, his office was "not aware of similar cases attributable to other anesthetic agents." (AR 0226). Dr. Ishak further noted that while the connection between Dirkes' exposure and his enzyme levels "cannot be dismissed entirely on a morphologic basis," the best way to determine whether such a connection existed would be clinically. (AR 0227).

### C. *Plaintiff's Leave of Absence and Application for Benefits*

On September 17, 2003, plaintiff applied for LTD benefits under the Plan. (AR 0681-682). AAC completed an Employer's Statement describing plaintiff's duties as a "staff anesthesiologist," administering anesthesia in an inpatient hospital setting; moving, lifting and transporting patients and operating equipment; extensive exposure to medical related hazards. (AR 0683).

Dr. Blitzer submitted a Physician's Statement on September 17, 2003, wherein he suggested that he had advised plaintiff to cease working on September 1, 2003. (AR 0177-178). Dr. Blitzer diagnosed plaintiff with drug hepatotoxicity secondary to anesthetic gas exposure and planned on treating plaintiff by monitoring and keeping him from the operating room. (AR 0177-178).

Dr. Blitzer further reported a firm connection between plaintiff's enzyme levels and gas exposure 17 days after plaintiff left the operating room and without the benefit of any additional enzyme profile. (AR 0177-178). According to Dr. Blitzer, plaintiff's

prognosis was good but he indicated, for the first time, that plaintiff could not return to work in the operating room. (AR 0177-178).

On April 9, 2004, plaintiff's claim for LTD benefits was denied. (AR 0603-0605). The decision relied on the Plan language, plaintiff's medical records, and his laboratory results through December 2003. Significantly, the denial letter noted that plaintiff had not reported any functional impairment resulting from the elevated transaminase levels. (AR 0603-0605). Per defendants, plaintiff's lab results did not establish that he was disabled because, despite having these elevated transaminase levels, plaintiff had been able to continue working in the operating room through August 29, 2003, and "there is no evidence to support any change or worsening of his condition as of that date. He reported no functional impairment resulting from the abnormal transaminase levels and Dr. Blitzer also noted no physical symptoms or restrictions other than avoidance of anesthetic gas exposure." (AR 0604). Accordingly, Hartford found that plaintiff was not continuously unable to perform the material and substantial duties of his specialty, and, therefore, was not disabled. (AR 0605).

*D. Plaintiff's Appeal and Hartford's Independent Medical Review*

Plaintiff appealed the denial of his LTD benefits claim, arguing that he was operating under a functional impairment. (AR 0308-310). Plaintiff attached a letter from Dr. Blitzer, who asserted that "continued chronic exposure to anesthetics in the work place *could* potentially be hazardous" and cause "exacerbation of hepatic injury with possible progressive fibrosis." (AR 0305-306) (emphasis added). Because the continued exposure "could potentially be hazardous," Dr. Blitzer concluded that plaintiff has a

-9-

functional impairment. (AR 0306).

On November 9, 2004, Hartford informed plaintiff that the administration of his claim was transferred to Hartford and requested additional information to review his claim. (AR 0374). In response, plaintiff then supplemented his claim with additional medical records.

In order to evaluate plaintiff's appeal, Hartford obtained an independent review of plaintiff's medical records from the University Disability Consortium. Dr. Carl W. Huff of University Disability Consortium, an orthopaedic surgeon, performed an independent review of plaintiff's medical records. (AR 0025-40). Dr. Huff discussed plaintiff's history of Gilbert's Syndrome. (AR 0026). He noted that Gilbert's Syndrome increases the effect that acetaminophen and nutritional and herbal supplements, all of which plaintiff had been taking, have on the liver. (AR 0027).

Dr. Huff further noted that plaintiff had been working as an anesthesiologist and had been exposed to anesthetic gases for almost 15 years prior to his abnormal liver enzyme test in 1999. (AR 0028). That fact "would mitigate against his abnormal liver function test being due to the anesthetic gases since the temporal relationship would not correlate." (AR 0028).

Dr. Huff examined plaintiff's 2004 blood tests and noted that the "pattern of ongoing liver enzyme elevation would strongly challenge the assertion that [Dirkes'] liver enzyme abnormalities are due to anesthetic gas exposure since he has been out of the OR [for almost one year]." (AR 0034). He explained that plaintiff reported "GGT of 189 (normal 8/61) is more than three times the upper normal and yet this is almost a year since

-10-

he has been exposed to any anesthetic gas." (AR 0034).

Dr. Huff found that if plaintiff's elevated enzymes were the result of exposure to anesthetic gases, "he would have manifested enzyme elevation prior to [1999] since he had worked in the field of anesthesia approximately 15 years prior to this date." (AR 0037-38). Plaintiff, on the other hand, worked with anesthetic gases for years before he developed any evidence of elevated liver enzymes and those levels did not decrease after he left the operating room. "Therefore, criteria of temporal relationship for a drug hepatotoxicity does not exist." (AR 0038).

Furthermore, he noted that plaintiff himself underwent surgery in 1998 in which he was directly exposed to anesthesia as a patient and did not develop high transaminase levels until 1999. (AR 0038). Finally, if the etiology were dose dependent, Dr. Huff found that plaintiff's transaminase levels would have decreased upon leaving the operating room, which did not occur. (AR 0038-39).

Ultimately, Dr. Huff concluded there was a "logical explanation for liver involvement, that is, the Gilbert's syndrome, which was diagnosed in 1991." (AR 0039). He noted the condition is "common" and that the interaction of the Gilbert's syndrome, herbal supplements, vitamin supplements, medications, and alcohol could produce the liver abnormalities evidenced by plaintiff's records." (AR 0039). Dr. Huff further concluded that there is no indication from reviewing this record that would indicate the liver enzyme abnormalities are in any way related to plaintiff's exposure to occupational anesthetic gases. (AR 0039). Dr. Huff also noted that the medical records "do not support any specific work restrictions in any particular environment." (AR 0039).

On January 14, 2005, upon review all of the medical records contained in plaintiff's file, various letters and documents supplied by his lawyer, the various Plan documents, and Dr Huff's independent medical evaluation, Hartford denied plaintiff's appeal and affirmed the prior determination that plaintiff is not disabled. (AR 092 -97.)

*E. Procedural History*

Thereafter, on April 14, 2005, Plaintiff filed the instant action seeking to recover long-term disability benefits. On July 7, 2005, defendants filed a motion to dismiss plaintiff's complaint against them because none of the named defendants are proper parties to this action pursuant to ERISA. (Doc. 2.) On July 25, 2005, plaintiff filed an amended complaint naming the Plan itself, the Group Long Term Disability Income Protection Plan of Anesthesia Associates of Cincinnati, Inc., as an additional defendant. (Doc. 4.)

Defendants then filed a renewed motion to dismiss on August 17, 2005, asserting that although the Plan is a proper defendant in an ERISA benefits action, defendants Continental Casualty Company ("Continental"), Charles Stedman & Co., Inc., and The Hartford Financial Services Group are still entitled to dismissal in this case because they took no part in determining Plaintiff's eligibility for benefits under the Plan. (Doc. 8.)

The motion was granted, and Continental Casualty Company, Charles Stedman & Co., Inc., and The Hartford Financial Services Group were terminated as party defendants. (*See* Docs. 12, 23). On September 6, 2006, plaintiff filed an amended complaint naming Hartford Life Group Insurance as a defendant.

Now before the Court are the parties cross-motions for judgment on the administrative record. For the reasons that follow, the undersigned find that plaintiff's claim should be remanded back to the Administrator for reconsideration.

## II. STANDARD OF REVIEW

The Court reviews *de novo* a denial of benefits under an ERISA plan "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *University Hosps. v. Emerson Elec. Co.,* 202 F.3d 839, 845 (6th Cir. 2000). If an administrator has such discretionary authority, the Court reviews the denial of benefits under the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111 (1989); *University Hosps.,* 202 F.3d at 845.

Here, the undersigned finds that the arbitrary and capricious standard applies in the present case because the long term disability insurance policy at issue gives Hartford discretionary authority. (Doc. 39 at 2-3.) "When a plan administrator has discretionary authority to determine benefits, [the Court] will review a decision to deny benefits under 'the highly deferential arbitrary and capricious standard of review.'" *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001) (quoting *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir. 1996)).

Nonetheless, as noted by the Sixth Circuit, merely because the review is deferential does not mean that it is inconsequential. *Moon v. UNUM Provident Corp.,* 405 F.3d 373, 379 (6th Cir. 2005). The court explained as follows:

-13-

> While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber-stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious ... standard does not require us merely to rubber stamp the administrator's decision." *Jones v. Metropolitan Life Ins. Co.,* 385 F.3d 654, 661 (6th Cir. 2004) (citing *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 172 (6th Cir. 2003)). Indeed, "[d]eferential review is not no review, and deference need not be abject." *McDonald,* 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *Id.*

*Id.*

Only if the administrative record supports a "reasoned explanation" for the termination of benefits is the decision not arbitrary or capricious. *See Williams v. International Paper Co.,* 227 F.3d 706, 712 (6th Cir. 2000) (cited in *Moon,* 2005 WL 664330, at *5). That is, the decision of the administrator is upheld if it is the result of a deliberate principled reasoning process, if it is supported by substantial evidence, and if it is based upon a reasonable interpretation of the plan. *Glenn v. MetLife*, *et al.*, --- F.3d ----, 2006 WL 2519293 *5 (6th Cir. Sept. 1, 2006) (quoting *Baker v. United Mine Workers of America Health and Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir.1991)).

## VI. ANALYSIS

Hartford maintains that plaintiff is able to perform all of the duties of his specialty, and therefore its decision to deny benefits is not arbitrary and capricious, even though plaintiff claims he might become unable to perform those duties in the further.

Plaintiff, however, asserts that Hartford's decision is unsupported by substantial evidence because Hartford ignored the "Common Care and Prudence Rule," improperly

rejected Dr. Blitzer's findings, improperly selected an unqualified consultant to perform an independent medical review, and improperly provided a "new" reason on appeal for the denial of benefits.

Upon careful review, the undersigned finds plaintiff's assertion that Hartford selected an unqualified consultant to perform a independent medical review to be dispositive, and based on the discussion below, hereby recommends that this matter be remanded to the Hartford for reconsideration after consultation with a liver specialist.

ERISA regulations provide that "in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, ... the appropriate named fiduciary <u>shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment</u>." 29 C.F.R. § 2560.503-1(h)(3)(iii). Plaintiff's asserts that Dr. Huff does not have experience in the field of medicine involved in the medical judgment at issue, and, therefore, is not qualified to perform the review. (Doc. 61-2 at 14).

Although Hartford maintains that Dr. Huff is board-certified both in preventive medicine and as an independent medical examiner, Hartford does not suggest that Dr. Huff is a liver specialist. (AR 0025-40). Moreover, the only documentation of Dr. Huff's qualifications appear beneath his signature line, which indicate that he is "Board Certified in Orthopedic Surgery/Preventative Medicine/Independent Medical Examiners." (AR 0040.)

In light of the complexity of plaintiff's claim, Hartford should have referred

plaintiff's appeal to a liver specialist with"appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii). The effect of Hartford's referral to an orthopaedic surgeon was to deny plaintiff a full and fair review of his claim. *See* 29 U.S.C. § 1133.

Accordingly, upon careful review, the undersigned finds that Hartford's denial of plaintiff's claim for benefits should be vacated and remanded back to Hartford for reconsideration after obtaining an independent medical review from a qualified liver specialist. *See Robinson v. Metro. Life Ins. Co.*, 05 Civ 1534, 2006 WL 1317019, at *2 (S.D.N.Y. May 12, 2006) (remanding case back to plan administrator for reconsideration of claim and review by a neurology specialist where appeal was originally submitted to an internist and pulmonary specialist who did not have the appropriate "training and experience in the field of medicine involved in the medical judgment"); *Krodel v. Bayer Corp.*, 145 F.Supp.2d 110 (D. Mass. 2004) (remanding case back to plan administrator for reconsideration of claim, specifically, for review by health care professional where administrator failed to seek any medical advice in making their determination as required by 29 CFR § 2560.503-1(h)(3)(iii)).

## IV.  CONCLUSION

Accordingly, based on the foregoing, it is hereby **RECOMMENDED** that Hartford's motion to affirm the administrative decision (doc. 49) be **DENIED**; plaintiff's motion to reverse the administrative record (doc. 41) be **GRANTED** consistent with the terms herein, and this matter **REMANDED** to Hartford for further factual determinations. On remand, Hartford shall obtain an independent medical review from a qualified liver specialist and shall provide the specialist's *curriculum vitae* and/or other sufficient documentation of the individual's qualifications as required by 29 C.F.R. § 2560.503-1(h)(3)(iii).

**IT IS SO RECOMMENDED**.

Date: February 19, 2008            s/Timothy S. Black
                                   Timothy S. Black
                                   United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

WILLIAM E. DIRKES, M.D.,

        Plaintiff,                                Case No. 1:05-cv-254

      vs.                                      Barrett, J.
                                               Black, M.J.

HARTFORD LIFE GROUP INSURANCE
COMPANY and GROUP LONG TERM
DISABILITY INCOME PROTECTION
PLAN of ANESTHESIA ASSOCIATES
OF CINCINNATI, INC.,

        Defendants.

## NOTICE

      Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **TEN (10) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **TEN (10) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).